**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **WATCHTOWER BIBLE TRACT SOCIETY OF NEW YORK, INC., et al.,**<br><br>   **Plaintiffs,**<br><br>   **v.**<br><br>**MUNICIPALITY OF AGUADA, et al.,**<br><br>   **Defendants.** | **CASE NO. 16-1207 (GAG)** |

**OPINION, ORDER AND TEMPORARY RESTRAINING ORDER**

On February 4, 2016, Watchtower Bible And Tract Society of New York and Congregación Cristiana de los Testigos de Jehová (collectively "Plaintiffs") filed suit against the following Municipalities: Aguada, Aguas Buenas, Añasco, Arecibo, Barceloneta, Cabo Rojo, Camuy, Canóvanas, Carolina, Cataño, Cayey, Cidra, Coamo, Corozal, Fajardo, Florida, Guánica, Guayama, Hatillo, Hormigueros, Humacao, Isabela, Juana Díaz, Loíza, Luquillo, Manatí, Mayagüez, Naguabo, Patillas, Río Grande, Salinas, San Germán, San Lorenzo, Toa Alta, Toa Baja, Vega Alta, Villalba and Yabucoa (hereinafter "Defendant Municipalities"),[1] alleging violations of their right to free speech and free exercise of religion, under the First and Fourteenth Amendments of the Constitution of the United States, pursuant to 42 U.S.C. § 1983. (Docket No. 1.) Plaintiffs request that the Court issue a declaratory judgment and grant a temporary restraining order

---

[1] The various Defendant-Municipalities herein comprise a majority of the remaining municipal entities in the Commonwealth of Puerto Rico, not named in the complaint in Case No. 04-1452, which included as defendants the municipalities of Bayamón, Caguas, Dorado, Gurabo, Guaynabo, Ponce, Trujillo Alto, San Juan, Santa Isabel, Vega Baja and Yauco.

("TRO"), as well as preliminary and permanent injunctive relief mandating that the named defendants comply with the terms of the permanent injunctive relief issued in <u>Watchtower Bible and Tract Soc'y of New York v. Mun. of Santa Isabel</u>, Case No. 04-1452 ("Watchtower Phase I").

After careful consideration, the Court **GRANTS in part and DENIES in part** Plaintiffs' Request for Temporary Restraining Order at Docket No. 2. Plaintiffs' Request for Preliminary Injunction is hereby **HELD IN ABEYANCE** until March 15, 2016 for the reasons and directives set forth below.

**I.      Standard of Review**

A TRO is an extraordinary remedy that should not be granted unless the movant proves the following elements: "(1) the plaintiff's likelihood of success on the merits; (2) the potential for irreparable harm in the absence of an injunction; (3) issuing an injunction will burden the defendants less than denying an injunction would burden the plaintiffs; and (4) the effect, if any, on the public interest." See <u>González-Droz v. González-Colón</u>, 573 F.3d 75, 79 (1st Cir. 2009).

The Supreme Court has recognized that "[t]he award of an interlocutory injunction by courts of equity has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff," and that where an injunction will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff."   <u>Weinberger v. Romero-Barceló</u>, 456 U.S. 305, 312-13 (1982) (internal quotations omitted).

**II.      Legal Analysis**

"A preliminary injunction is an extraordinary remedy never awarded as of right." <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 24 (2008). "In each case, courts must balance the

competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Id. (internal quotations omitted).

1. Likelihood of success on the merits

This factor weighs in favor of Plaintiffs given the doctrine of *stare decisis* (i.e., First Circuit Opinions in Watchtower Bible and Tract Soc'y of New York v. Sagardía de Jesús, et al., 634 F.3d 3 (1st Cir. 2011) (finding Puerto Rico's control access law constitutional as applied and recognizing that Jehovah's Witnesses are allowed to enter urbanizations to engage in constitutionally protected activity), reh'g denied, 638 F.3d 8, cert. denied, 132 S. Ct. 549 (2011); and Watchtower Bible and Tract Soc'y of New York v. Mun. of San Juan, 773 F.3d 1 (1st Cir. 2014) (affirming the District Court's remedial scheme crafted on remand) cert. denied, 135 S. Ct. 2395 (2015)). The Court also considers the fundamental constitutional rights involved, the Witnesses' right to free speech and exercise of religion on public property, and finds that Plaintiffs are likely to succeed on the merits.

2. Irreparable Harm

Plaintiffs claim they risk irreparable harm absent injunctive relief in light of their upcoming religious activity, an annual worldwide campaign to invite their neighbors to attend the Memorial of Christ's death, an activity catalogued as the most sacred event of their religious practice. (Docket No. 2 at 24.) Thus, Plaintiffs argue that in view of the upcoming religious activity, imminent and irreparable harm will result if Jehovah's Witnesses are not allowed to engage in their time-sensitive religious speech in public streets. Id. at 25. "A burden on protected speech always causes some degree of irreparable harm." Bl(a)ck Tea Soc'y v. City of Boston, 378 F.3d 8, 15 (1st Cir. 2004) (citing Elrod v. Burns, 427 U.S. 347, 373-74 (1976)). Notwithstanding the above, the Court notes that this very harm is present, and will continue to be present, absent a comprehensive

**Civil No. 16-1207 (GAG)**

remedial scheme that is fully incorporated from start to finish, as with the original Defendant Municipalities in Watchtower Phase I.

3. <u>Public Interest</u>

"[A] determination of the public interest necessarily encompasses the practical effects of granting or denying preliminary injunctive relief." <u>Bl(a)ck Tea Soc'y</u>, 378 F.3d at 15. There is significant public interest in that Jehovah's Witnesses engage in free speech and exercise religious faith in all public areas. As the Court has mentioned in the past, this is the same First Amendment right Catholics exercise when they partake in Via Crucis processions in public streets during Holy Week, (<u>see</u> Case No. 04-1452, Docket No. 1512), and politicians who go door-to-door greeting constituents while campaigning for primaries and general elections, as will occur in the upcoming months. <u>See</u> <u>id.</u> at Docket No. 1074.

4. <u>No other adequate remedy at law</u>

There is no other remedy at law. Plaintiffs do not seek monetary damages. The singular relief sought is injunctive relief granting them access to public streets within gated communities.

5. <u>Weighing of the equities</u>

At first, the Court's remedial scheme in this case may seem as simple as ordering relief identical to that in Watchtower Phase I. The task at hand, however, is much more complex. This case is not simply about adopting overnight the orders of the First Circuit and this Court. It is about implementing an already-established remedial scheme in dozens of municipalities across the island —a challenge that took considerable time for the Court to create and implement in Watchtower Phase I. (<u>See</u> <u>e.g</u>. Case No. 04-1452, Docket Nos. 1083 & 1118 (Court monitoring enforcement and compliance by Defendant Municipalities)).

The scheme's implementation was not all in a day's work; instead, it took months to get a majority of the Municipal Defendants in compliance.  The remedial scheme has indeed worked effectively, but success did not occur overnight.   As the Plaintiffs well know, a municipality has to enact an action plan, and enforce the same, opening gates to non-complying urbanizations.  Granted, in Watchtower Phase I the Court did impose strict deadlines, yet attaining compliance was an uphill battle.  Eventually, sanctions were imposed for each day of non-compliance. <u>Id.</u> at 1264.  In fashioning the remedial scheme, the undersigned conducted an in-depth study and ultimately crafted a scheme that met Plaintiffs' requests and guaranteed their constitutional rights.  In doing so, the Court weighed in on lists of each municipalities' gated communities, both manned and unmanned; ordered Municipalities to direct and ensure all manned communities grant Jehovah's Witnesses unfettered access; ordered the Defendant Municipalities to direct and ensure all unmanned communities provide beepers and keys to Jehovah's Witnesses; and most importantly, afforded Defendant Municipalities adequate opportunity to educate its citizenry.

In addition, a significant amount of time and effort was devoted to handling issues that arose with some municipalities and urbanizations that were hesitant to comply with the Court's orders.[2]  Mindful of the public opposition triggered by the case, and in an effort to educate the public on the subject of Plaintiffs' constitutional rights, the undersigned embarked on a more informative approach when issuing its Orders.  In an Order dated May 6, 2013, the undersigned outlined the procedural history and applicable law regarding the rights of Jehovah's Witnesses to access public streets in Puerto Rico.  (<u>See</u> Case No. 04-1452, Docket No. 1074.)  In said Order, the Court addressed many of the public's concerns regarding the Court's Orders granting the

---

[2] Even at the present, the Court is still addressing issues in Watchtower Phase I.  Next Wednesday the undersigned, while sitting in Ponce, will hear summary judgment oral arguments as to whether the streets of Estancias del Golf Club in the Municipality of Ponce are public or wholly private.  <u>See</u> Case No. 04-1452, Docket No. 1692.

Witnesses public access to gated communities. The Court gave a detailed explanation of Jehovah's Witnesses' right to free speech and free exercise of religion under the First Amendment. Id. The Court also addressed concerns of public safety.

> The Court has not granted unfettered access to violent criminals, nor should any knowledgeable or reputable person spread such fear. The gates were erected as a means to reduce crime on the island. Since the enactment of the Control Access Law, crime has not substantially abated on the island. The Court is not aware of a single instance in which any Jehovah's Witness has been charged or convicted of a crime while expressing his or her religious beliefs. The Jehovah's Witnesses enjoy the same First Amendment rights as all residents of Puerto Rico. If access to public streets can be denied to them, then access can be denied to anyone. For example, an aspiring politician will be barred from going door-to-door seeking endorsements. Likewise, the press could also be prevented from entering a gated community to cover the reactions of residents to a court ruling, as that in this case. More so, during Easter, Catholics could similarly be barred from participating in a Via Crucis on public streets.

Watchtower, 2013 WL 1908307, at *3 (D.P.R. May 6, 2013). The Court also noted that "the Commonwealth of Puerto Rico, as part of the greatest Democracy of our time, guarantees every one of its citizens' religious, political, social and other precious freedoms. Even today, many nations of the world inadequately protect, or worse, fail to protect, these rights that we often take for granted." Id. at 4. The Court went further, reflecting on the public disagreement caused by the Watchtower litigation and reminded and cautioned that this historical litigation "demonstrates this Nation's deep history of protecting civil liberties. Any antipathy by individual residents of gated communities towards Jehovah's Witnesses *or members of any other religious faith should yield to common sense and respect for the Rule of Law, product of the United States and Puerto Rico Constitutions.*" Id. (emphasis in original).

As in Watchtower Phase I, the parties, individual urbanizations and the Court will have to focus on multiple non-compliance issues, requests for contempt and other actions. However, the initial Order the Court issues today with specific directives, will avoid confusion by allowing the parties to focus on the issues relevant for permanent injunctive relief, and separating those

municipalities that are willing to comply with the law from those who are not willing or want to exercise their right to litigate the matter further. It is the Court's perception that in the case of the Defendant Municipalities in Watchtower Phase I, time to carefully implement all Court orders has been Plaintiffs' greatest ally. Religious intolerance has subdued via the use of the federal court. The public has realized that, like every citizen, Jehovah's Witnesses enjoy the same constitutional rights, and the Witnesses enjoy their door-to-door apostolate. When a given urbanization does not comply, the federal court does not hesitate to give the parties their day in Court.

As in Brown v. Board of Education, Plaintiffs' First Amendment rights to free speech and free exercise of religion shall be afforded with "all deliberate speed." 349 U.S. 294, 301 (1955). The Court intends to address all matters accordingly. But all deliberate speed requires this Court to implement a constitutional remedial scheme in the most effective manner, not simply in the quickest manner, which may later prove futile.

By weighting all the factors described above, the Court finds that Plaintiffs' TRO request is not the appropriate vehicle to implement such a comprehensive remedial scheme as this matter warrants, as implemented in Watchtower Phase I. Similarly, issuing a preliminary injunction within such a brief period will, in the Court's experience, work against the implementation of such a scheme. See Bl(a)ck Tea Soc'y, 378 F.3d at 15 (affirming the District Court's denial of TRO request for injunctive relief on First Amendment protected speech ground and recognizing "impracticability of eleventh-hour injunctive relief."). Consequently, Plaintiffs' TRO as requested is denied.

Notwithstanding the above, because actionable and irreparable harm is imminent given the Witnesses' upcoming holiday, the Court hereby grants Plaintiffs a TRO in a limited fashion, specifically tailored to address and tend to their protected religious-speech, while at the same time

guaranteeing the Municipal Defendants' right to due process.  The Court, in an effort of balancing the parties' respective rights, will order the Defendant Municipalities to grant Jehovah's Witnesses access to the urbanizations listed in Plaintiffs' request for TRO.  This access will be granted <u>for one day</u>.  Municipal police and/or representative(s) of each municipal government shall be physically present at the entrance of each gated community to ensure Jehovah's Witnesses are allowed access and can engage in their door-to-door ministry.  In the alternative, the municipal personnel may, prior to February 18, 2016, inform <u>in person</u> each of the named gated communities that on said date and times they must allow the entry of Jehovah's Witnesses.

For the reasons explained above, Plaintiffs' request for TRO is hereby **GRANTED in part and DENIED in part** as follows:

**III.    Temporary Restraining Order and Directives**

Since it appears that Plaintiffs will suffer immediate and irreparable injury before this litigation moves forward, the Court hereby issues the following Temporary Restraining Order and thus **ORDERS** that:

1. For the purpose of safeguarding Jehovah's Witnesses' protected speech, pending the preliminary injunction and until further orders of the Court, Defendant Municipalities, their officers and any other persons in active concert and participation with them are hereby ordered to provide and ensure that Jehovah's Witnesses **have access to the controlled access urbanizations listed below, on Thursday, February 18, 2016 from 8:00A.M. to 5:00P.M.**  Municipal police and/or representative(s) of each municipal government shall be physically present at the entrance of their gated communities to ensure Jehovah's Witnesses are allowed access and can engage in their door-to-door ministry.  In the alternative, the

    municipal personnel may, prior to February 18, 2016, inform <u>in person</u> each of the named gated communities that on said date and times they must allow the entry of Jehovah's Witnesses.[3]

2. The instant TRO is granted as to the following gated communities (listed by Municipality):

    1) <u>Aguada</u>: Las Casonas (also known as Las Casonas de Aguada), and Las Villas Sotomayor (also known as Villas de Sotomayor).

    2) <u>Aguas Buenas</u>: Brisas de Palmasolas (also known as Brisas de Palma Sola or Palmasola) and Estancias del Río.

    3) <u>Añasco</u>: Hacienda Libertad, Los Arboles and Paseo del Valle.

    4) <u>Arecibo</u>: Brisas del Mar, Calle Flamingo, Ciudad Atlantis, Colinas de Palmarito, Costas del Mar, Estancias Balseiro (also known as Balseiro), Haciendas del Mar, Haciendas Monte Verde, Jardines de Betania, Jardines del Junco, Los Corales, Los Pinos II, Paseo de los Ángeles, Paseo Esmeralda (also known as Paseo La Esmeralda), Paseo Los Húcares, Paseo Los Robles, Paseos de la Reina, Reparto Diocesano, Valle Escondido, Villa Lucía, Villa Mena, Villas del Remanso, and Vistamar Estates I & II (also known as Vistamar Estates).

    5) <u>Barceloneta</u>: Brisas del Monte (also known as Monte Brisas) and Cimarrona Court.

---

[3] As a cautionary note, the Court reminds all parties that the present order only applies to the named Defendant Municipalities in Case No. 16-1207. The permanent injunctive relief afforded to Plaintiffs in Case No. 04-1452 is neither altered nor affected by the Court's ruling. As of this moment, the cases have not been consolidated therefore they are still separate litigations.

6) <u>Cabo Rojo</u>: Alturas del Mar, Bello Horizonte, Boquerón Country Club, Campo Mar, Estancias de Monte Grande, Estancias de Plan Bonito, Estancias Esperidiona y Los Prados (also known as Estancias Esperidiona or Estancias de Esperidiona), Estancias Reales de Cabo Rojo (also known as Estancias Reales), Hacienda Bonita, Hacienda de la Baume (also known as Hacienda de Baume), Haciendas de Cabo Rojo, Joyuda Coast, La Nereidas, Mansiones de Cabo Rojo, Mirador del Sol (also known as Mirador del Sol Sector Parabuayon), Monika del Mar, Paraíso de Boquerón, Paseo del Duque, Paseos de Plan Bonito, Puerta del Combate (also known as Puertas del Combate Estates), Quintas de Cabo Rojo, Quintas de Miradero de Cabo Rojo (also known as Quintas de Miradero), Reparto Oliveras, Terrazas de Boquerón, Veredas del Mar, Villas de Plan Bonito, and Mansiones.

7) <u>Camuy</u>: Altamonte (also known as Alto Monte), Alturas del Maestro, Haciendas Camuy (also known as Haciendas de Camuy), Paseo Las Flores, and Hacienda La Sabana.

8) <u>Canóvanas</u>: Estancias del Río Canóvanas (also known as Estancias del Río), Haciendas de Canóvanas (also known as Hacienda de Canóvanas), Las Magas, Las Quintas de Altamira Canóvanas (also known as Las Quintas de Altamira), Mansiones del Tesoro, and Las Haciendas (also known as Las Haciendas de Canóvanas).

9) <u>Carolina</u>: Colinitas de Cacao, Los Arboles, Quintas de Campeche, Remanso Taino, Villas del Sol and Hacienda Real.

10) <u>Cataño</u>: Mansiones del Parque (also known as Mansiones).

**Civil No. 16-1207 (GAG)**

11) <u>Cayey</u>: Colinas de Cayey, Colinas View, El Remanso, Hacienda Vistas del Plata, and Vista Sur Planation & Country Club.

12) <u>Cidra</u>: Brisas de Monticello, Haciendas de Treasure Island, Treasure Island Gardens (also known as Jardines de Treasure Island), and Bosque Real.

13) <u>Coamo</u>: Hacienda Miraflores de Coamo (also known as Miraflores), La Arboleda, Provincias del Río I (also known as Provincias I), and Provincias del Río II (also known as Provincias II).

14) <u>Corozal</u>: Los Próceres de Corozal (also known as Los Próceres), Vistas del Río I, Vistas del Río II, and Vistas del Río III.

15) <u>Fajardo</u>: Mansiones Punta del Este (also known as Mansiones del Este).

16) <u>Florida</u>: Altos de Florida, Haciendas de Florida, and Reparto Diana.

17) <u>Guánica</u>: Playa del Sur.

18) <u>Guayama</u>: Chalets de Brisas del Mar, Hacienda Los Recreos, Reparto La Sabana (also known as La Sabana), San Martín (also known as Villas de San Martín), Vistamar (also known as Vista Mar), and Camino de la Princesa.

19) <u>Hatillo</u>: Camino Las Palmas, Colinas de Hatillo, Costa Norte, Estancias de Carrizales, Estancias de Palma Gorda (also known as Estancias Palma Gorda), Hillside Estates, Mansiones San Antonio, Montemar, Monte Verde, Paseo Las Palmas, Paso del Campo (also known as Paseo del Campo), Royal View, Valle Verde, Verde Luz, and Villa Gertrudis.

20) <u>Hormigueros</u>: Mansiones La Monserrate (also known as Mansion de Monserrate), Paseo La Ceiba (also known as La Ceiba), Paseo Los Peregrinos, and Haciendas Constancia.

21) <u>Humacao</u>: El Retiro.

22) <u>Isabela</u>: Llanos de Isabela, Mirador del Cielo, Reparto Durán (also known as Rpto. Durán), Sol y Mar, Villas de España (also known as Villas España), and Villas de Karen (also known as Villas Karen).

23) <u>Juana Díaz</u>: Estancias del Río, Hacienda de Casa Blanca, Lago Horizonte (also known as Lago Horizonte I), Las Quintas (also known as Las Quintas de Jacaguas), Valle Esmeralda, Colinas del Prado and Villas del Prado.

24) <u>Loíza</u>: Loíza Estates.

25) <u>Luquillo</u>: Hacienda Paloma II, Luquillo Hills, River Edge Hills, Paisaje del Lago and Paisaje del Río.

26) <u>Manatí</u>: Estancias de Santa Maria, Estancias de Valle Verde, Los Rosales I (also known as Los Rosales 1), Los Rosales II (also known as Los Rosales 2), Quintas Mariana, Reparto Rosello, Santa Teresa, Valle Encantado, Villa Forestal, Estancias de Manatí and Porto Fino.

27) <u>Mayagüez</u>: Colinas de Alturas de Mayagüez (also known as Colinas de Alturas), Cumbres de Miradero (also known as Cumbre Miradero or Parque Forestal-Cumbres de Miradero), Estancias de San Benito (also known as San Benito), Jardines de Guanajibo, Mansiones de España, Parque La Ceiba (also known as Parque de la Ceiba), Quintas de Santa María (also known as Quintas de Santa María-Extensión), Senderos del Valle, Sonsire Chalets (also known as Sunsire Chalets), Villa Capitán (also known as Villa del Capitán), Villa Sonsire (also known as Villa Sunsire or Balcones de Villa Sonsire),

Vista del Mar, and Quintas de Monte Río Mayagüez (also known as Quintas de Monte Río).

28) <u>Naguabo</u>: Hacienda Grande de Naguabo (also known as Hacienda Grande) and Jardín del Este (also known as Jardines del Este).

29) <u>Patillas</u>: Solymar Patillas (also known as Solimar).

30) <u>Río Grande</u>: El Verde Homes, Estancias del Verde, Hacienda Jiménez, Hacienda Las Garzas Río Grande (also known as Hacienda Las Garzas), Lindo Mar, Montecillo, Villa Cambalache II-A (also known as Villas de Cambalache II), Villas del Mar Coco Beach (also known as Coco Beach), and Villas del Rey (also known as Hacienda del Rey).

31) <u>Salinas</u>: Mansiones de Salinas, Marbella, and Solana.

32) <u>San Germán</u>: Garden Hills.

33) <u>San Lorenzo</u>: Mansiones de Monte Sereno (also known as Monte Sereno), Paseo de las Flores (also known as Paseo las Flores), Portal del Sol, and Villas del Hato.

34) <u>Toa Alta</u>: Alturas de Montecasino, Brisas del Lago, Estancias de San Miguel, Hacienda El Pilar, Hacienda Paola, Hacienda Vista Real, Las Villas (also known as Villas), Preciosas Vistas del Lago, Quintas de Santa Ana, Reparto Valle Verde y Quintas de San Ramón, Terrazas del Toa y La Providencia, Terrazas del Toa III (also known as La Tercera Seccion de Terrazas del Toa y la La Providencia), Toa Linda, Valle del Paraíso, Veredas del Río I, Veredas del Río II, Villas Norel, Woodbridge Park, and Campos del Toa.

**Civil No. 16-1207 (GAG)**

35) <u>Toa Baja</u>: Alturas de Covadonga, Alturas Hacienda Dorada, Extensión Lagos de Plata (also known as Lagos de Plata), Mansiones del Lago, and Pabellones.

36) <u>Vega Alta</u>: Alturas de Cerro Gordo I y II, Alturas de Cerro Gordo III y IV, Coconut Court, Estancias de San Nicolás, Golden Village, Isomar, Ocean Breeze, Palmas de Cerrogordo (also known as Las Palmas de Cerro Gordo), Residencias del Palmar, The Clusters, and Grand Palm II (also known as also known as Grand Palm).

37) <u>Villalba</u>: Estancias de Santa Rosa.

38) <u>Yabucoa</u>: Valles de Yabucoa.

3. Because this case involves Plaintiffs' First Amendment rights and enforcement of orders that have already been adjudicated in Plaintiffs' favor, the Court in its discretion waives the posting of a bond. <u>See</u> <u>Crowley v. Local No. 82, Furniture & Piano Moving</u>, 679 F.2d 978, 1000 (1st Cir. 1982), <u>rev'd on other grounds</u>, 467 U.S. 526 (1984) (First Circuit recognition that district court has discretion to waive security bond requirement in "suits to enforce important federal rights or public interests.").

4. Pursuant to Federal Rules of Civil Procedure 65(b), on two days' notice to Plaintiffs, Defendants may appear and request the dissolution or modification of this TRO.

5. This TRO will expire on **Thursday, February 18, 2016, 5:01 P.M.**, unless within such time this Order is extended for good cause and/or Defendants consent to an extension.

**Civil No. 16-1207 (GAG)**

6. Plaintiffs shall serve personally upon all Defendants no later than **Friday**, **February 12, 2016, 5:00 P.M.** a copy of their Verified Motion for a Temporary Restraining Order and Preliminary Injunction, as well as the instant Order. Plaintiffs shall thereafter notify the Court via informative motion.

**IV.     Initial Directives**

The named Defendant-Municipalities in this case shall, on or before **March 15, 2016, SHOW CAUSE** as to why they should not be ordered to comply with the constitutional remedy fashioned by the United States Court of Appeals for the First Circuit in Watchtower Bible and Tract Soc'y of New York v. Sagardía de Jesús, et al., 634 F.3d 3 (1st Cir. 2011) (finding Puerto Rico's control access law constitutional as applied and recognizing that Jehovah's witnesses are allowed to enter urbanizations to engage in constitutionally protected activity), reh'g denied, 638 F.3d 8, cert. denied, 132 S. Ct. 549 (2011); Watchtower Bible and Tract Soc'y of New York v. Mun. of San Juan, 773 F.3d 1 (1st Cir. 2014) (affirming the District Court's remedial scheme crafted on remand) cert. denied, 135 S. Ct. 2395 (2015), and the District Court in Case No. 04-145 (Docket Nos. 710 (granting declaratory injunctive relief on remand); 718 (entering judgment); 904 (reiterating First Circuit's recognition of Plaintiffs' constitutionally protected right to engage in door-to-door ministry); 978 (amended partial judgment as to unmanned urbanizations); 1074 (Order summarizing the law and court Orders regarding the right of Jehovah's Witnesses to access public streets in gated communities in Puerto Rico, 2013 WL 1908307 (D.P.R. May 6, 2013)); 1173 (Certification of private roads issue to Puerto Rico Supreme Court, 2013 WL 2554879 (D.P.R. 2013)); 1264 (imposing sanctions against Municipalities for non-compliance); 1478 (second amended partial judgment on remand)). These shall be collectively referred to as "Watchtower Phase I Directives."

**Plaintiffs are hereby ordered to serve all Defendants with process, along with copy of this Order, as well as the Watchtower Phase I Directives no later than Friday, February 12, 2016**. The Municipal Defendants, on or before March 15, 2016, shall indicate to the Court that they concede to and accept that Watchtower Phase I Directives shall apply to them, or that they will proceed to litigate the case. The rulings of the First Circuit and this Court pertain to one legal issue, namely the Jehovah's Witnesses' right to engage in activity protected by the First Amendment in public streets located within controlled access communities throughout the various municipalities. The First Circuit's mandate constitutes the applicable constitutional federal "law of the land." It is the controlling law in the District of Puerto Rico, thus, under the doctrine of *stare decisis*, the controlling law must be applied, absent convincing argument to the contrary – quite possibly a herculean task.

On one hand, the Municipalities that agree with the federal appellate and District Court mandates shall be afforded a fair opportunity for constitutional compliance as were the Defendant Municipalities in Watchtower Phase I. They will be given time to confer with Plaintiffs, making reasonable effort to reach agreements as to the terms of each municipality's action plan. There is no reason why this cannot be accomplished within reasonable time. This will also avoid imposition of any attorney's fees, which, as the Municipalities in Watchtower Phase I, can affect their respective coffers. Any issues particular to a given urbanization, shall be addressed individually. Defendant Municipalities that are in agreement shall so inform the Court on or before **March 15, 2016**.

On the other hand, Municipalities that do not agree with the federal appellate and District Court mandates and directives shall answer the complaint and/or move to dismiss the same on or before **March 15, 2016**.

**Civil No. 16-1207 (GAG)**

No extensions to the above **March 15, 2016** deadline will be allowed. Any Municipal Defendant that does not respond as to either alternative will be considered as having conceded to the first alternative and, accordingly preliminary injunctive relief will issue. Compliance with these deadlines and directives is imperative, given that now dozens of Municipalities are involved, as well as the necessity of Plaintiffs to immediately exercise their First Amendment right to religious expression.

The Court wants to make one thing very clear: the Plaintiffs' request for TRO has not been granted only in part because it lacks merit. To the contrary, the Court is mindful of Plaintiffs' likelihood of success. However, the Court understands that, by virtue of the present directives, municipalities that want to voluntarily come into compliance with the law of the land can readily do so, and those that choose to litigate the matter may. In other words, giving the Municipal Defendants thirty days to comply will best serve the public interest by allowing for a uniform remedy for all. It will also allow the Court to best use its limited time and resources, given the extremely high volume of criminal cases on its docket. The Court intends to eventually consolidate this case with Watchtower I. The order shall issue at an appropriate moment.

The Court further notes that federal court intervention, now involving a majority of the island's municipalities, could be significantly reduced or even avoided, should the Commonwealth's Legislature enact a comprehensive piece of law addressing the issues resolved by the First Circuit and District Court in Watchtower Phase I. Such legislation would put an end to this litigation, which ultimately is shouldered by tax payers.

In addition, Counsel Paul Polidoro and Keturah A. Dunne's requests to appear *pro hac vice* at Docket Nos. 7 & 8, respectively, are hereby **GRANTED**. Because the Court will eventually consolidate both cases, and because Mr. Polidoro is already appearing *pro hac vice* in Watchtower

**Civil No. 16-1207 (GAG)**

I, he will not be required to pay the mandatory fee for this case, which is *de facto* an amended complaint adding additional defendants of Plaintiffs' complaint in Watchtower I. The Clerk of Court shall return any such fee paid by Mr. Polidoro in the above-captioned case.

The Plaintiffs, if not satisfied with this order, may seek reconsideration and propose realistic alternatives. However, the thirty days period given to Defendants, plus an additional period of sixty days to subsequently implement the Watchtower I scheme will carry the day for all.

**V.    Conclusion**

Accordingly, Plaintiffs' Request for TRO at Docket No. 2 is **GRANTED in part and DENIED in part**, as detailed in this Order. Plaintiffs' Request for Preliminary Injunction is **HELD IN ABEYANCE** until **March 15, 2016**, whereupon Defendant Municipalities must **SHOW CAUSE**.

S**O ORDERED.**

In San Juan, Puerto Rico this 10th day of February, 2016.

*s/ Gustavo A. Gelpí*
GUSTAVO A. GELPI
United States District Judge